## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **M.K.,** *a minor by and through his father and Next Friend, Greg Koepp* | § § § § | **PLAINTIFF** |
| **v.** | § § | **Civil No. 1:22-cv-25-HSO-BWR** |
| **PEARL RIVER COUNTY SCHOOL DISTRICT; P.B.,** *a minor by and through his parents;* **P.A.,** *a minor by and through his parents;* **I.L.,** *a minor by and through his parents;* **L.M.,** *a minor by and through his parents; and* **W.L.,** *a minor by and through his parents;* **ALAN LUMPKIN; CHRIS PENTON; AUSTIN ALEXANDER; STEPHANIE MORRIS; TRACEY CRENSHAW; BLAKE RUTHERDORD; JOHN DOES 1-10** | § § § § § § § § § § § § § § § § § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION [39] FOR SUMMARY JUDGMENT

In this Title IX lawsuit against Defendants Pearl River County School District, Alan Lumpkin, Chris Penton, Austin Alexander, Stephanie Morris, Tracey Crenshaw, and Blake Rutherford by Plaintiff M.K., a former student at Pearl River Central Middle School, the Court considers Defendants' Motion [39] for Summary Judgment. Defendants assert that Plaintiff M.K. cannot prove the elements of his Title IX claim for deliberate indifference to sex-based bullying. Specifically, Defendants argue that M.K. cannot show at trial: (1) that "the harassment was based on [his] sex," (2) that "the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] [his] access to an educational

opportunity or benefit," or (3) that "the district was deliberately indifferent to the harassment."  Memorandum [40] at 6 (internal quotation marks and citations omitted) (second alteration in original).

Having considered the parties' arguments and drawn all reasonable inferences from the record in M.K.'s favor, the Court agrees with Defendants that M.K. cannot establish that the harassment was based on his sex or that it was severe and pervasive.  Defendants' Motion [39] for Summary Judgment should be granted, and this case will be dismissed.

## I. BACKGROUND

A.   Plaintiff's allegations in the Complaint [1]

Plaintiff M.K. ("Plaintiff" or "M.K.") is a minor child who was enrolled at Pearl River Central Middle School ("PRCMS") in Carriere, Mississippi, for the 2021-2022 school year.  Compl. [1] at 4.  The Complaint [1] alleges that not long after starting classes at PRCMS, M.K. "began to experience harassment and bullying" at the hands of former defendants, minors P.B., P.A., I.L., L.M. and W.L., referred to collectively in the Complaint [1] as "the Bullies."  *Id.* at 5.  According to the Complaint [1], the bullying "consisted of primarily name calling and refences [sic]" to M.K. being homosexual.  *Id.*  M.K. alleged that he and his parents reported the Bullies' behavior, but that "no reasonable action was taken to prevent the harassment."  *Id.*

M.K. asserts that on October 19, 2021, he was followed into the bathroom by I.L., "who had been bullying M.K. all day."  *Id.* at 6.  At this point, M.K. believed

2

that being called "gay" meant that the Bullies were calling him a girl.  *Id.*  In what M.K. claims was as an attempt "to prove that he was a boy, not a girl, to his bullies," he exited a bathroom stall "with his male genitals exposed" to I.L.[1]  *Id.*  I.L. reported this incident to a teacher, who questioned both students.  *Id.*  When M.K. failed to answer the teacher's questions, M.K. was allegedly "interrogated" by several male employees, "in an effort to bully and intimidate M.K. into talking."  *Id.*

Following a hearing in front of a school Disciplinary Committee, the Committee recommended that M.K. "be removed from [PRCMS] and assigned to the Pearl River Central Endeavor School through the end of the semester."  *Id.* at 8 (quoting Ex. [1-1] at 1).  M.K. appealed the Disciplinary Committee's recommendation, but the "punishment was upheld by the school board."  *Id.*

M.K. alleges that he decided to be homeschooled for the remainder of the semester rather than attend Pearl River Central Endeavor School, which he described as being "essentially a prison," and that this decision was "approved by the superintendent."  *Id.*  Before the start of the following semester, M.K. claims that he, through counsel, contacted the Superintendent, Alan Lumpkin, to ensure that "there were no unresolved issues."  *Id.*  M.K. asserts that Superintendent Lumpkin responded by "unilaterally alter[ing] the punishment" and informing M.K. that he could not reenroll at PRCMS until he first enrolled at Pearl River Central Endeavor School for six weeks.  *Id.* at 9.  Through his father, M.K. brought the present suit.

---

[1] As discussed *infra* in Part I.C., M.K. later testified that he was in fact using the urinal, and that another student saw him exposed while he was zipping his fly.  *See* Ex. [39-1] at 11–12.

B.     Procedural history

M.K. originally named as defendants Pearl River County School District

("PRCSD"); five students whom he called his bullies, by and through their parents;

Alan Lumpkin, individually and as Superintendent; Chris Penton, individually and

as a school official; and the four members of the Disciplinary Committee that

consulted Lumpkin and Penton before M.K.'s suspension, Austin Alexander,

Stephanie Morris, Tracey Crenshaw, and Blake Rutherford, individually and as

school officials.  *See* Compl. [1].  M.K.'s claims against the individual students were

dismissed without prejudice on November 7, 2022.  Order [19] (dismissing claims

against the minor Defendants P.B., P.A., I.L., L.M., and W.L. without prejudice,

pursuant to Federal Rule of Civil Procedure 4(m)).  Among other claims, M.K.

alleged that PRCSD and the defendants who worked for it were deliberately

indifferent to sex-based harassment that he experienced in the form of being called

"gay."  Compl. [1] at 10–11.  *See Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204,

210 (5th Cir. 2019) (discussing how "a school's 'deliberate indifference' to a student's

claims of sexual harassment by a classmate may amount to an intentional violation

of Title IX." (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643–46

(1999))).

The Court previously dismissed all of M.K.'s claims except for his Title IX

claims—the deliberate-indifference claim and a retaliation claim—and a Fourteenth

Amendment claim under the Equal Protection Clause in a December 20, 2022 Order

[25] Granting in Part and Denying in Part Defendants' Motion [4] to Dismiss.

Defendants now move for Summary Judgment on the remaining Title IX and Fourteenth Amendment claims. Mot. [39]. M.K. concedes the retaliation claim and the Fourteenth Amendment claim in his Response [41] to Defendants' Motion [39] for Summary Judgment, *see* Resp. [41] at 8–9, leaving only the Title IX deliberate-indifference claim for resolution.

C.      Summary judgment record

In their memoranda, the parties essentially dispute what a jury could reasonably conclude from M.K.'s deposition testimony. *See generally*, Memoranda [40], [41], [42]. According to M.K., he began attending public school for fifth grade after his parents home-schooled him for first through fourth grade. Ex. [39-1] at 3. "[I]n fifth grade, [he] had to do the Google Meet thing the first half of the year" due to COVID-19, "and then part of the year [he] was at the actual public school." *Id.* When M.K. was in fifth grade, he and his friends would play games on their Google Chromebooks during recess. *Id.* The other students would tease him for being "bad at the game." *Id.* But M.K. testified that any teasing from his fellow students "wasn't as bad in fifth grade as it was in sixth grade." *Id.* at 4. He responded, "Not really," when asked whether he "consider[ed] [that] anybody [was] bullying [him] when [he was] in fifth grade," *id.*, and he testified that some other students would call him "dog water," "a common insult to people who are bad at games," *id.* "And there was also a kid that made fun of [him] just a little bit for being short." *Id.* But while that student "did tease" M.K., "he didn't really bully" him. *Id.*

In sixth grade, M.K. took six classes: Science, "[C]omputer," Band, Math,

Language Arts, and History. *See* Ex. [39-1]. Of those classes, "[S]cience was the most chaotic class" in that the science "class picked on [him] the most." Doc. [39-1] at 8. Other students in Science started bullying M.K. "about two weeks in" to the school year. *Id.* at 5. But M.K. did not testify that his classmates called him "gay" during Science. Rather, he was mocked for losing video games that the students would play on their Google Chromebooks before class began, and for being short. *See id.* When asked, "[W]hat did they start saying in science class?" M.K. answered, "Just dog water, like usual." *Id.* When asked, "Did they say any other things about you in science class, other than just dog water, referring to the video games?" M.K. responded, "I think one of them called me Trash. Like the big deal was -- like they were kind of overwhelming with it in sixth grade. Like they would keep on saying it and saying it and saying it, and it would just drive me crazy." *Id.* at 6. M.K. affirmed that he was not called any names in Science other than "dog water" and "Trash." *Id.*

During his next class, "[C]omputer class," the students "had to be flat out quiet" and wear headphones. *Id.* So, M.K. testified that he did not have problems with other students during his Computer class. *See id.*

M.K.'s next class was Band, which was "crazy." *Id.* "When they first started calling me gay it was in the band class." *Id.* Specifically, two of M.K.'s fellow students would call him "gay." *Id.* at 6–7. M.K. told the Band teacher, whose name he could not recall, "about like one or two times" that the other students were calling him names, including "gay." *Id.* at 7. He "told her in front of other people,"

meaning the rest of the class.  *Id.*  When Band would end, the students would "be talking and not paying attention to anything," so the other students would "probably not" have heard him report the name-calling to the Band teacher.  *Id.*  M.K. testified that he did not "hear or see [his Band] teacher talk to those students after [he] reported [the name-calling] to her."  *Id.*

M.K.'s next class was Math, where he "just had problems with" one particular student—"I.L."—because I.L. "was sitting right behind [him] whispering, calling [him] gay."  *Id.*  I.L. would call M.K. "Gay and Gay Boy," along with "[s]hort."  *Id.*  M.K. told his Math teacher, Ms. Averett, about I.L.'s behavior "[m]aybe like three times."  *Id.*  In response, Ms. Averett brought the students before her and told them that "she didn't want to hear it anymore."  *Id.*  M.K.'s "understanding" was that she meant to say "[b]oth," that "she didn't want to hear [him] talk about [I.L. calling him gay] anymore" and that "she didn't want [I.L.] to" continue calling him gay.  *Id.*  M.K. did not witness Ms. Averett speak with I.L. individually about his behavior.  *Id.*

M.K.'s next class was Language Arts.  *Id.*  In Language Arts, he would have "[a]bout the same problems [he] had in math class" with I.L.  *Id.* at 7–8.  When the school year began, I.L. sat close to M.K. in Language Arts.  *Id.* at 8.  M.K. testified that he informed his Language Arts teacher, Ms. Pierce, about I.L. picking on him "[m]aybe like two times."  *Id.*  Eventually, Ms. Pierce "noticed that [he and I.L.] were fighting a lot," and then she moved I.L.'s seat "all the way to the other side of the room."  *Id.*  By fighting, M.K. meant "[a]rguing" about topics including "how

[M.K. was] not gay." *Id.*

M.K.'s last class of the day was History, taught by Mr. Cunningham. *Id.* M.K. testified that he did not have many problems in History because he "got to choose where [he sat] most of the time, so [he] could choose to sit away from the boys" who called him names in other classes. *Id.*

When defense counsel finished asking M.K. to review how each of his classes went, he had the following colloquy with him about other students calling him gay:

> Q. And what did you think it meant I guess when they were calling you gay?  Did you think it . . . .
> A. Maybe because I, like, dressed up in like blue and red most of the time, like, maybe bright colors at first.  And then it ticked me off then.
> Q. Right.
> A. So I decided, okay, you think I'm gay, I'm going to show you an example of what gay is.  So yeah, that just made it worse.
> Q. You're talking about the bathroom incident?
> A. No, I'm not talking about the bathroom incident.
> Q. Oh, okay.  How else did you show them an example of what gay is?
> A. Like blowing kisses, like that's gay.  You get it?  That's gay.
> Q. Oh, okay.
> A. Pretty much.
> Q. So you were just doing that back to them when they would call you gay?
> A. Yeah.  Like I was, like, showing them, like, what gay is and that I am not gay.
> Q. I got you.
> A. But that made it worse.
> Q. Oh, so they just picked on you more?
> A. Yeah.
> Q. So I guess what I'm guessing is when they called you gay, what did you think being gay meant?
> A. Either like a boy wants to love another boy or a transgender or that.
> Q. So you had a general understanding what that meant?
> A. Yes.

Ex. [39-1] at 11.

M.K. was involved in two incidents during the Fall of his sixth-grade year

involving the students he identified as "bullies" in his Complaint [1].  *See* Compl. [1] at 4.  In one, W.L. "was real[ly] bullying" him by calling him gay in the hallway before Math, so he cursed at him.  Doc. [39-1] at 9–10.  M.K. told W.L., "(indicated) you."  *Id.* at 10.  His teacher, Ms. Averett, heard him curse, so she wrote him up.  *Id.*

In the other incident, M.K. and his fellow students "were walking on the sidewalk before [class] and [one student], like, unzipped [another's] backpack and then . . . unzipped [M.K.'s]."  *Id.* at 8.  "So [M.K.] decided [he'd] slap [the student] in the face," though he "didn't slap [him] full on."  *Id.*  The student responded by shoving M.K. into a post that was connected to an awning.  *Id.* 8–9.  M.K. scraped his elbow on the concrete sidewalk when he fell.  *Id.* at 9.  M.K. reported the incident to "Coach Penton," whom he described as "second in command," or an "assistant principal."  *Id.*  M.K. thought he reported the incident to his "next class teacher" as well.  *Id.*  M.K. only reported the incident to Coach Penton when he got in trouble for cursing at W.L.  *Id.*  M.K. later heard Coach Penton call the student who shoved him to the office, but he could not remember how the school handled the incident.  *Id.*

M.K.'s issues at school came to a head on October 19, 2021, during an incident in a boy's bathroom during which M.K.—according to PRCSD's findings following a disciplinary hearing—flashed I.L., resulting in his six-week suspension. Ex. [39-4] at 6.  M.K. testified that the bathroom incident occurred during a break he took during "Reading," which presumably meant Language Arts.  Ex. [39-1] at 11.  M.K. raised his hand to ask to use the bathroom during class, and after the

teacher gave him permission, she gave I.L. permission to use the restroom as well.

*Id.* Both students went to the bathroom at the same time. *Id.*

M.K. testified as follows about what occurred in the bathroom:

Q. So when you went to the bathroom, did [I.L.] call you any names?
A. No.  I was just straightening myself out and he decided to report to the teacher, and then the reading teacher got me outside of the hallway and started making eye contact with me and asking me questions.  She started storming back into the class and then class was over.  I go to history class.  Then I hear, [I.L.], please come to the office.  Then when [I.L.] comes back, I hear, [M.K.], please come to the office.
Q. Okay.  So whatever happened in the bathroom, was it intentional?
A. It wasn't intentional, no.
Q. Because I've read some things that have been kind of produced because there's this lawsuit going on that said maybe you were trying to show him you weren't gay.  Is that not what you were doing?
A. No, that's not what I was doing.

*Id.* at 11.  Essentially, M.K. testified that I.L. used the stall while he used the

urinal, and I.L. saw him after he turned around, but while he was still zipping his

fly.  *See id.*  M.K. testified that he was then called to the office, where he spoke with

Coach Penton, telling him that it was an "accident."  *Id.* at 12.

M.K. was eventually told that he had to go to "alternative school."  *Id.* at 13.

But after a tour of the school, his family decided he would be home-schooled instead

during his suspension.  *See id.* at 14–15.  M.K. testified that he would like to go

back to public school, and that he has "a feeling if [he] just got to go back like

tomorrow, [he'd] just be like, [']Okay, where is [I.L.] at?  He owes me a slap on his

face.[']"  *Id.* at 13.  When asked, "[a]nd then you'd just move on?" he responded,

"Yes."  *Id.*  And when asked, "Do you want to go back to school just to see him or

just because you want to be back in the school system?" he answered, "I want to be

back in a public school, period." *Id.*

## II. DISCUSSION

A.   Relevant legal standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "When the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *McClendon v. United States*, 892 F.3d 775, 781 (5th Cir. 2018) (quotation omitted). "All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor of the non-moving party." *Id.* (quotation omitted). The non-moving party cannot avoid summary judgment "by presenting speculation, improbable inferences, or unsubstantiated assertions." *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quotation omitted).

Under Title IX, no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) ("Title IX"). Title IX is "enforceable through an implied private right of action," and "monetary damages are available in the implied private action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). Title IX damages are

11

available when "the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). Thus, a school's "deliberate indifference" to a student's claims of sexual harassment by a classmate may amount to an intentional violation of Title IX. *See id.* at 643–46.

To recover for deliberate indifference under Title IX, a plaintiff must prove five elements:

(1) the [defendant] had actual knowledge of the harassment;
(2) the harasser was under the [defendant's] control;
(3) the harassment was based on the victim's sex;
(4) the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit; and
(5) the defendant was deliberately indifferent to the harassment.

*Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (third alteration in original) (internal quotation marks and citations omitted). Importantly, "to be actionable, the harassment must be more than the sort of teasing and bullying that generally takes place in schools; it must be 'severe, pervasive, and objectively unreasonable.'" *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (quoting *Davis*, 526 U.S. at 652). Defendants argue that they are entitled to summary judgment based upon the third, fourth, and fifth elements of deliberate indifference. Because the Court agrees as to the third and fourth elements, it need not address the fifth element.

B.  <u>The harassment was not based on M.K.'s sex (the third element)</u>

A deliberate-indifference to student-on-student harassment claim will not lie

unless the harassment occurred "on the basis of sex."  20 U.S.C. § 1681(a); *see Roe*, 53 F.4th at 341.  M.K. argues that other male students calling him "gay" was harassment based on homosexuality, and that discrimination based on homosexuality is discrimination on the basis of sex.  *See* Resp. [41] at 2–3.  M.K. does not claim to be gay, and in fact denied during his deposition that he is gay.  *See* Ex. [39-1] at 11 ("I am not gay.").  But the Court proceeds under the assumption that Plaintiff is correct that "harassment due to a victim's perceived homosexuality is sufficient to constitute" harassment on the basis of the victim's sexual orientation, "regardless of whether the victim is in fact gay."  Resp. [41] at 3 (citing *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d 1165, 1170 (N.D. Cal. 2000)).

Sexual harassment between students of the same sex is actionable under Title IX.  *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).  "The offensive behavior, however, must still be based on sex, per the words of title IX, and 'not merely tinged with offensive sexual connotations.'"  *Sanches*, 647 F.3d at 165 (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002)).

To date, the Fifth Circuit has not directly addressed whether Title IX's prohibition of discrimination "on the basis of sex" extends to discrimination on the basis of sexual orientation.  *Cf. Neese v. Becerra*, 640 F. Supp. 3d 668, 678 (N.D. Tex. 2022) (per Kacsmaryk, J.) (discussing how, "[a]lthough the Fifth Circuit has held 'transgender discrimination is a form of sex discrimination under Title VII,' it has not held as much with respect to Title IX or Section 1557," (quoting *Olivarez v.*

*T-mobile USA, Inc.*, 997 F.3d 595, 603 (5th Cir. 2021)), and addressing the issue as one of first impression).  The question then becomes whether, as Plaintiff argues, Title IX covers discrimination on the basis of sexual orientation.

A court should "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment."  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (2020).  When Congress passed Title IX in 1972, "'sex' was commonly understood to refer to physiological differences between men and women — particularly with respect to reproductive functions."  *Neese*, 640 F. Supp. at 678 n.6 (citing Sex, *American Heritage Dictionary* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); Sex, *Webster's Third New International Dictionary* 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . . .")). Contemporary dictionaries concur.  *See* Sex, *Black's Law Dictionary* (11th ed. 2019) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; gender"); Sex, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/sex (last accessed December 15, 2023) ("either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures"); Sex, *Concise Oxford American Dictionary* 822 (2006) ("either of the two main categories (male and female) into which humans and

14

many other living things are divided on the basis of their reproductive functions").

Also of note, dictionaries have defined "sexual orientation" and "homosexuality" differently from "sex" since the time period when Congress enacted Title IX. *See* Homosexuality, *Webster's Third New International Dictionary* 1085 (1961) (defining "homosexuality" as "1: atypical sexuality characterized by manifestation of sexual desire toward a member of one's own sex," or "2: erotic activity with a member of one's own sex"); Sexual Orientation, *Concise Oxford American Dictionary* 822 (2006) ("a person's sexual attraction toward members of the same, opposite, or both genders"); Sexual Orientation, *Black's Law Dictionary* (11th ed. 2019) ("A person's predisposition or inclination toward sexual activity or behavior with other males or females; heterosexuality, homosexuality, or bisexuality."). The foregoing leads to the conclusion—and Plaintiff does not contend otherwise—that one's sex and one's sexual orientation are distinct concepts. As Plaintiff points out, however, the Supreme Court has held that 42 U.S.C. § 2000e-2's ("Title VII") prohibition on employment discrimination "because of [the employee's] . . . sex" covers discrimination based on the employee's sexual orientation. *See Bostock*, 140 S. Ct. at 1737, 1746–46.

> *Bostock* relied on Title VII's use of the phrase "because of," emphasizing:
>
> The question isn't just what "sex" meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions "because of" sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'"

*Id.* at 1739 (quoting *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009))).

15

Title VII's use of the phrase "because of" formed a key component of *Bostock*'s reasoning that sexual-orientation discrimination necessarily entails consideration of sex. *See id.* at 1739 ("Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation.") (internal quotation marks and citation omitted).  The Court explained how, "[o]ften, events have multiple but-for causes," and how "a but-for test directs us to change one thing at a time and see if the outcome changes." *Id.*  Because an employer would need to take account of an employee's sex to determine that the employee is in a same-sex relationship, for example, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.* at 1747.

The Court reached this conclusion despite acknowledging that "[t]hose who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result" because courts must follow "the written word" of a statute instead of "the limits of the drafters' imagination." *Id.* at 1737.  And the Court "agree[d]" with the employer's argument "that homosexuality and transgender status are distinct concepts from sex." *Id.* at 1746–47; *see id.* at 1747 ("'Sexual harassment' is conceptually distinct from sex discrimination, but it can fall within Title VII's sweep." (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998))).

Plaintiff invites the Court to extend *Bostock*'s reasoning to Title IX, but it is not prepared to do so.  This is because Title VII employs different language than

Title IX.  *See also Bostock*, 140 S. Ct. at 1753 (emphasizing that "other laws" that prohibit sex discrimination were not "before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today").  Unlike Title VII, Title IX does not state that it prohibits discrimination "because of . . . sex," § 2000e-2; rather, it prohibits discrimination "on *the basis of* sex." § 1681(a) (emphasis added).  While "because of" and "on the basis of" are similar phrases, the use of the indefinite article—"the"—indicates that *the* basis of the discrimination must be the student's sex.  Indeed, the Supreme Court has recently relied on the use of an indefinite article in a statute to determine that it contemplated "a discrete, countable thing." *See Niz-Chavez v. Garland*, 593 U.S. 155, 162–63 (2021) (explaining how the use of "a" in the phrase "a notice to appear" in 8 U.S.C. § 1229b(d)(1) "suggests that the government must issue a single statutorily compliant document" to complete service of the notice to appear).

Because the student's sex must be *the* basis of Title IX harassment, *Bostock*'s reasoning that sexual-orientation discrimination entails sex discrimination because the employee's sex is one of "multiple but-for causes" of the discrimination, cannot apply. *Bostock*, 140 S. Ct. at 1739.  *Bostock* acknowledged as much.  *See id.* at 1748 ("The employers might be onto something if Title VII only ensured equal treatment between groups of men and women or if the statute applied only when sex is the sole or primary reason for an employer's challenged adverse employment action.").  The foregoing leads the Court to conclude that, as written, the language of Title IX does not cover sexual-orientation discrimination.

17

Beyond the differences between Title IX and Title VII's language, the Court must scrutinize Title IX for a *clear statement* that it covers sexual-orientation discrimination because Congress enacted Title IX under the Spending Clause, whereas it enacted Title VII under the Commerce Clause.  *See Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause . . . .").  Because Congress's power "'to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution'" under the Spending Clause, Congress can attach conditions to states' receipt of federal funds.  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *United States v. Butler*, 297 U.S. 1, 66 (1936)).  As the Supreme Court explained when it recognized a private right of action under Title IX for deliberate indifference to student-on-student harassment, "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'"  *Davis*, 526 U.S. at 640 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

Given that "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract,'" the Supreme Court "insist[s] that Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds.  *Pennhurst*, 451 U.S. at 17.  In other words, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Id*.  The requirement of a

clear statement of conditions from Congress "enable[s] the States to exercise their choice [to accept federal funds] knowingly, cognizant of the consequences of their participation." *Id.*

The Supreme Court has not adopted such a clear-statement rule for the interpretation of statutes—such as Title VII—enacted under the Commerce Clause. *See generally Bostock*, 140 S. Ct. (never mentioning the application of a clear-statement rule); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549–50 (2012) (discussing the "expansive scope" of Congress's "power to '*regulate* Commerce,'" (quoting U.S. Const. art. I, § 8, cl. 3)); *id.* at 577, 579–80 (holding the Affordable Care Act's Medicaid expansion unconstitutional under the Spending Clause because it coerced states to "accept" "new conditions" on "States' existing Medicaid funds," and emphasizing how "[t]he legitimacy of Congress's exercise of the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the contract" (internal quotation marks and citation omitted)). *Bostock* therefore did not confront the constitutional dimension of interpreting a Spending Clause statute, further limiting its application to this case.

The Court is not inclined to conclude that the language of Title IX reflects that Congress unambiguously intended to cover student-on-student harassment on the basis of sexual orientation. The statute's language exclusively discusses discrimination on the basis of sex, and sex is a different concept from sexual orientation. *See Bostock*, 140 S. Ct. at 1746–47 ("agree[ing]" with the argument "that homosexuality and transgender status are distinct concepts from sex").

For all of these reasons, the Court will decline Plaintiff's invitation to extend Title IX to cover sexual-orientation discrimination.  Defendants are thus "entitled to judgment as a matter of law" on the third element of Plaintiff's Title IX claim.  Fed. R. Civ. P. 56.

C.  <u>The harassment was not so severe, pervasive, and objectively offensive that it effectively barred M.K.'s access to an educational opportunity or benefit (fourth element)</u>

Nor has M.K. pointed the Court to facts in the record that can reasonably be said to establish that the alleged bullying was "so severe, pervasive, and objectively offensive, and . . . so undermine[d] and detract[ed] from [his] educational experience, that [he was] effectively denied equal access to [PRCSD's] resources and opportunities."  *Davis*, 526 U.S. at 651.  "Whether gender-oriented conduct rises to the level of actionable harassment . . . depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved."  *Id.* (internal quotation marks and citations omitted).  The test is objective; whether M.K. "was sincerely upset" "makes no difference."  *Sanches*, 647 F.3d at 167.  The Court "bear[s] in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults."  *Davis*, 526 U.S. at 651.  And "to be actionable, the harassment must be more than the sort of teasing and bullying that generally takes place in schools."  *Sanches*, 647 F.3d at 167.

*Sanches* illustrates how the Fifth Circuit views the requirement that the

20

harassment be severe and pervasive.  There, the plaintiff, Ms. Sanches, a female

high school student, claimed that her alleged harasser, "J.H.," "started a rumor that

Sanches 'had a hickey on her boob'"; "'cornered' Sanches in the hallway during a

passing period" and "'told [her] that she [J.H.] was having sex with'" Sanches's

boyfriend before "wiping the tears from [Sanches's] eyes"; and "slapped [Sanches's

boyfriend's] buttock as she walked by Sanches and [Sanches's boyfriend]."  647 F.3d

at 162.  Emphasizing that "students are still learning how to interact appropriately

with their peers," and how they "often engage in insults, banter, teasing, shoving,

pushing, and gender-specific conduct that is upsetting to the students subjected to

it," *Sanches* affirmed the district court's grant of summary judgment, finding the

plaintiff could not support the severe-and-pervasive element of her Title IX claim.

*Id.* at 167 (quoting *Davis*, 526 U.S. at 651–52).

    Here, M.K.'s deposition testimony supports that he was called gay by several

other students in three of his sixth-grade classes during the first month or two of

the school year.  *See* Ex. [39-1].  In Band, students called him gay to the point that

he reported the conduct to his teacher one or two times.  *See id.* at 7.  In Math, he

was called gay to the point that he reported the name-calling to his teacher three

times.  *See id.*  In Language Arts, he had problems with one student before his

teacher moved the student's seat.  *See id.* at 8.[2]

---

[2] Meanwhile, during Science, when he was bullied the most, *see* Ex. [39-1] at 8, other students did not call M.K. gay.  They instead used terms such as "dog water," "a common insult to people who are bad at games."  *Id.* at 4.  Because this name-calling was plainly not on the basis of M.K.'s sex, it is not actionable and thus does not factor into the Court's consideration of the severity and pervasiveness of his harassment.  Likewise, the record does not support an inference that the incident during which M.K. slapped a student who unzipped his backpack, who then responded to M.K.'s slap by shoving him, was based on M.K.'s sex.

While no one deserves to be repeatedly called names, the Court concludes that, as a matter of law, the conduct here—name-calling over the course of a month or two—does not meet the high threshold required to support a deliberate indifference claim under Title IX.  Like the bully in *Sanches*, the bullies here used "insults, banter, [and] teasing" that was "upsetting" to M.K.  647 F.3d at 167 (quoting *Davis*, 526 U.S. at 651).  But nothing in the record supports a conclusion that the name-calling was so pervasive and severe that it effectively "denie[d] [M.K.] the equal access to education that Title IX is designed to protect."  *Davis*, 526 U.S. at 652.  If anything, M.K. seems eager to return to school.  He testified that he would like to go back to public school and that he would move on from past name-calling.  Ex. [39-1] at 13.  Nor has M.K. pointed to any evidence in the record that he had to drop out of school or could not substantially participate in his courses. *See Henderson v. Bd. of Supervisors of S. Univ. & A&M Coll.*, No. CV 21-297-JWD-RLB, 2023 WL 2614620, at *11 (M.D. La. Mar. 23, 2023) ("Plaintiffs do not allege that Thompson was forced to change his study habits or move to another district, was withdrawn from school because of the harassment, or that his grades declined as a result of the four days of bullying.").

M.K. cites cases in his Response [41] that involved far more severe harassment than he testified that he experienced.  In *Patterson v. Hudson Area Schools*, bullies called the victim names including "gay," "queer," and "fag" hundreds of times per year during seventh and ninth grades, and during ninth grade, one student shoved his penis against the victim's face in the locker room

while another blocked his exit.  No. 05–74439, 2007 WL 4201137, at *1–4 (E.D. Mich. Nov. 28, 2007).  In *Theno v. Tonganoxie Unified Sch. Dist. No. 464*, the plaintiff "was routinely called names such as 'fag,' 'faggot,' 'jack-off boy,' 'banana boy,' 'queer,' 'flamer,' or 'masturbator'"; and was subjected to constant bullying based on a rumor that he masturbated in the restroom, resulting in "four years of harassment designed to emasculate, humiliate, and ridicule him."  377 F. Supp. 2d 952, 968, 972–74 (D. Kan. 2005).  The bullies drew pictures of him on chalkboards and "spat on the wall in the bathroom and said, 'Look, Dylan was here,'" *id.* at 973, and one "put a piece of string cheese in his mouth and said 'I'm Dylan sucking a dick.,'" *id.*  The plaintiff "was diagnosed with post-traumatic stress disorder, anxiety disorder, and avoidant personality disorder that likely stemmed from the harassment.  The harassment was so humiliating that the plaintiff eventually left school, and therefore, under all of these circumstances, the trier of fact could conclude that he was deprived of educational opportunities."  *Id.* at 968.  Importantly, the court noted that "[t]he name-calling, standing alone, probably would not be sufficient to withstand summary judgment."  *Id.* at 965.

M.K. also asserts a theory that his suspension from school and reassignment to the Endeavour School resulted from a build-up of bullying that led him to flash one of the bullies to prove he was a boy.  *See* Resp. [41] at 7.  One problem with this theory is that M.K. himself testified that the alleged flashing was unintentional.  *See* Ex. [39-1] at 11–12.  That would mean it could not have been the result of harassment.

In any event, assuming M.K. could prove this theory at trial based on PRCSD's conclusion that he did, in fact, act intentionally, the test for whether harassment rises to the level of severe and pervasive is objective. *Sanches*, 647 F.3d at 167. If it "makes no difference" whether M.K. "was sincerely upset," he surely cannot meet the severe and pervasive test on a theory that his own misconduct in response to alleged harassment meant the name-calling he experienced was objectively severe and pervasive. *See id.* The Court therefore concludes that Defendants are entitled to summary judgment as to the fourth element of M.K.'s Title IX claim. In sum, Defendants' Motion [39] for Summary Judgment should be granted.

## III. <u>CONCLUSION</u>

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants Pearl River County School District, Alan Lumpkin, Chris Penton, Austin Alexander, Stephanie Morris, Tracey Crenshaw, and Blake Rutherford's Motion [39] for Summary Judgment is **GRANTED**, and Plaintiff M.K.'s deliberate-indifference and retaliation claims under Title IX, and his Equal Protection claim under the Fourteenth Amendment, are **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this the 21st day of December, 2023.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE